James E. Torske
314 North Custer Avenue
Hardin, Montana, 59034
406-665-1902
Attorney for Defendant

## IN THE CROW TRIBAL CIVIL COURT
## IN AND FOR THE CROW INDIAN RESERVATION
## PO BOX 489
## CROW AGENCY, MONTANA, 59022
## (406) 638-7400; FAX (406) 638-7415

| | | |
|---|---|---|
| ALDEN BIG MAN, | ) | **CIVIL CASE NO. 2012-118** |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **DEFENDANT'S** |
| | ) | **RESPONSE TO PLAINTIFF'S** |
| | ) | **MOTION FOR SUMMARY** |
| BIG HORN COUNTY ELECTRIC | ) | **JUDGMENT** |
| COOPERATIVE, INC., a | ) | |
| Montana Corporation, | ) | |
| | ) | |
| Defendant. | ) | |

## TABLE OF CASES

| Case Name | Page No. |
|---|---|
| *Atkinson Trading Co. v. Shirley*<br>532 U.S. 645, 121 S. Ct. 1825, 149 L. Ed. 2d 889<br>[28 Indian L. Rep. 1019] (2001) | 3, 4, 6 |
| *Big Horn County Electric, Inc. v. Adams*<br>219 F.3d 944 (9th Cir. 2000) | 7 |
| *MacArthur v. San Juan County*<br>497 F.3d 1057, [34 Indian L. Rep. 2190] (10th Cir. 2007) | 6 |
| *Merrion v. Jicarilla Apache Tribe*<br>455 U.S. 130, 71 L. Ed. 2d 21, 102 S. Ct. 894 (1982) | 9 |
| *Montana v. United States*<br>450 U.S. 544, 101 S. Ct. 1245, 67 L. Ed. 2d 493<br>[8 Indian L. Rep. 1005] (1981) | 4, 5, 6, 7, 8 |
| *Nat. Farmers Union Ins. Cos. v. Crow Tribe*<br>471 U.S. 845, 85 L. Ed. 2d 818, 105 S. Ct. 2447 | 2 |
| *Nevada v. Hicks*<br>533 U.S. 353, 121 S. Ct. 2304,<br>150 L. Ed. 2d 398 [28 Indian L. Rep. 1031] (2001) | 3, 4, 5, 6, 8 |
| *Osborn v. United States*<br>918 F.2d 724, (8th Cir. 1990) | 2 |
| *Plains Commerce Bank v. Long Family Land & Cattle Co.*<br>128 S. Ct. 2709, 171 L. Ed. 2nd 457<br>[35 Indian L. Rep. 1011] (2008) | 3, 4, 5, 6, 7, 8, 9 |
| *Smith v. Salish Kootenai College*<br>33 Indian L. Rep. 2026, (2006) | 2, 5 |
| *Strate v. A-1 Contractors*<br>520 U.S. 438, 117 S. Ct. 1404, 137 L. Ed. 2d 661<br>[24 Indian L. Rep. 1015] (1997) | 4, 5, 6 |
| *United States v. Wheeler*<br>435 U.S. 313, 98 S. Ct. 1079, 55 L. Ed. 2nd 303<br>[5 Indian L. Rep. A-33] (1978) | 4 |
| *Williams v. Lee*<br>358 U.S. 217, 79 S. Ct. 269, 3 L. Ed. 2d 251 (1959) | 7, 8 |

James E. Torske
314 North Custer Avenue
Hardin, Montana, 59034
406-665-1902
Attorney for Defendant

## IN THE CROW TRIBAL CIVIL COURT
## IN AND FOR THE CROW INDIAN RESERVATION
## PO BOX 489
## CROW AGENCY, MONTANA, 59022
## (406) 638-7400; FAX (406) 638-7415

| | | |
|---|---|---|
| ALDEN BIG MAN, | ) | **CIVIL CASE NO. 2012-118** |
| | ) | |
| Plaintiff, | ) | |
| | ) | **DEFENDANT'S** |
| v. | ) | **RESPONSE TO PLAINTIFF'S** |
| | ) | **MOTION FOR SUMMARY** |
| BIG HORN COUNTY ELECTRIC | ) | **JUDGMENT** |
| COOPERATIVE, INC., a | ) | |
| Montana Corporation, | ) | |
| | ) | |
| Defendant. | ) | |

COMES NOW, BIG HORN COUNTY ELECTRIC COOPERATIVE, INC., (hereinafter Big Horn), the defending party, by and through its counsel of record, JAMES E. TORSKE, and hereby submits its Response to Plaintiff's Motion for Summary Judgment.

### INTRODUCTION

Rule 19 of the Rules of Civil Procedure set forth in the Law and Order Code of the Crow Tribe adopts Rule 56 of the Federal Rules of Civil Procedure as the applicable law governing summary judgment proceedings in the Crow Tribal Court.

Federal Rule 56(C)(2) provides "a party may object that the material cited to support . . . a fact cannot be presented in a form that would be admissible in evidence." Because Defendant has raised the ultimate genuine issue of material

1

fact, the question of jurisdiction of the Tribal Court, a comprehensive substantive analysis of factual matters, not now before the Court, must be considered before this Court may decide upon the issue of its jurisdiction to decide this case.

Appellate courts rely upon tribal courts to fully develop the record in justification of assumption of jurisdiction over non-members. Acknowledging this, the United States Court of Appeals for the Eighth Circuit stated:

> "In analyzing the jurisdictional issue we rely on the record developed in the tribal courts and the allegations in the tribe's complaint. Questions of subject matter jurisdiction often require resolution of factual issues before the court may proceed, *see, e.g., Osborn v. United States*, 918 F.2d 724, 728-30 (8th Cir. 1990), and that is particularly true of inquiries into tribal jurisdiction. It is therefore both necessary and appropriate for the parties and the tribal court to ensure that "a full record [is] developed in the Tribal Court." *Nat'l Farmers Union*, 471 U.S. at 856, 105 S. Ct. 2447.

The Defendant, Big Horn, objects to Plaintiff's motion based upon Federal Rule 56(C)(2) as it is incumbent upon the Court to first engage in a good faith inquiry into the regulatory authority of the Crow Tribe over the activities or conduct of the Defendant before it can be decided whether the Court has adjudicatory jurisdiction in this case. The fact Tribal Code promulgating Title 20 Utilities was adopted is not admissible evidence of its enforceability as against Big Horn.

In a case involving extensive analysis of tribal civil jurisdiction, the Ninth Circuit Court pointed out the importance of jurisdictional inquiry stating:

> There is a potential for injustice in any case where we vacate a judgment and dismiss for lack of jurisdiction and the concept of limited governmental power. Lack of subject matter jurisdiction, whether in a federal court or in a tribal court, renders a judgment null and void, and a party may not escape from this long established doctrine by claiming that a consent can confer jurisdiction on a court. *Smith v. Salish Kootenai College*, 33 Indian L. Rep. 2026, 2033 (2006)

## ISSUE

Whether the Crow Tribe may, through adoption of a utility code, regulate the activities or conduct of Big Horn, thereby altering existing contractual relationships with its members, including Plaintiff.

## ARGUMENT

Whether a tribal court has authority to adjudicate claims against a nonmember is a federal question within the jurisdiction of the federal courts. *Plains Commerce Bank v. Long Family Land & Cattle Co.*, 128 S. Ct. 2709, 2716, 171 L. Ed. 2nd 457 [35 Indian L. Rep. 1011] (2008). Where, as here, tribal jurisdiction is not specifically authorized by federal statute or treaty, a tribe's adjudicatory authority must stem from its "retained or inherent sovereignty." *Atkinson Trading Co. v. Shirley*, 532 U.S. 645, 649-50, 121 S. Ct. 1825, 149 L. Ed. 2d 889 [28 Indian L. Rep. 1019] (2001).

The scope of tribal civil authority over nonmembers remained "ill-defined" as recently as 2001. *Nevada v. Hicks*, 533 U.S. 353, 376, 121 S. Ct. 2304, 150 L. Ed. 2d 398 [28 Indian L. Rep. 1031] (2001) (Souter, J., concurring). Determining the contours of tribal civil jurisdiction and the boundaries of tribal sovereignty requires consideration of the historical scope of tribal sovereignty and the evolving place of the tribes within the American constitutional order, careful study of precedent, and ultimately a "proper balancing" of the conflicting interests of the tribes and nonmembers. *Id.* at 374 (opinion of the Court).

As the Supreme Court has recently observed, the "'sovereignty that the Indian tribes retain is of a unique and limited character.' It centers on the land held by the tribe and on tribal members within the reservation." *Plains Commerce*

3

*Bank*, 128 S. Ct. at 2718 (quoting *Wheeler*, 435 U.S. at 323, 98 S. Ct. 1079). Although there are exceptions, tribes generally no longer "possess authority over non-Indians who come within their borders." *Id.*

The federal principles which govern tribal civil jurisdiction over nonmembers were set out in *Montana v. United States*, 450 U.S. 544, 101 S. Ct. 1245, 67 L. Ed. 2d 493 [8 Indian L. Rep. 1005] (1981), and that decision remains the "'pathmarking case' on the subject." *Hicks*, 533 U.S. at 358, 121 S. Ct. 2304 (quoting *Strate v. A-1 Contractors*, 520 U.S. 438, 445, 117 S. Ct. 1404, 137 L. Ed. 2d 661 [24 Indian L. Rep. 1015] (1997)).   In *Montana*, the Supreme Court concluded that the Crow Tribe lacked the power to prohibit hunting and fishing by nonmembers on non Indian fee land within the reservation because "exercise of tribal power beyond what is necessary to protect tribal self-government or to control internal relations is inconsistent with the dependent status of the tribes." 450 U.S. at 564, 101 S. Ct. 1245.   As a general matter, the Court held, "the inherent sovereign powers of an Indian tribe do not extend to the activities of nonmembers of the tribe." *Id.* at 565, 101 S. Ct. 1245. Accordingly, "efforts by a tribe to regulate nonmembers, especially on non-Indian fee land, are 'presumptively invalid.'" *Plains Commerce Bank*, 128 S. Ct. at 2720 (quoting *Atkinson*, 532 U.S. at 659, 121 S. Ct. 1825).

As the Supreme Court explained, however, "Indian tribes retain inherent sovereign power to exercise some forms of civil jurisdiction over non-Indians on their reservations, even on non-Indian fee lands." *Montana*, 450 U.S. at 565, 101 S. Ct. 1245.   The Court has recognized two categories of nonmember conduct which may be regulated by tribes, commonly termed the "*Montana* exceptions."

4

First, a "tribe may regulate, through taxation, licensing, and other means, the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements." *Id.* Second, a "tribe may also retain inherent power to exercise civil authority over the conduct of non-Indians on fee lands within its reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe." *Id*. at 566.

The *Montana* exceptions are rooted in the tribes' inherent power to protect certain sovereign interests. *See Plains Commerce Bank*, 128 S. Ct. at 2723. Paramount among those interests is the right of Indian tribes to "make their own laws and be governed by them," *Hicks*, 533 U.S. at 361, 121 S. Ct. 2304, and in accordance with that right tribes "may regulate nonmember behavior that implicates tribal governance and internal relations." *Plains Commerce Bank*, 128 S. Ct. at 2723. Ultimately then, "'[t]ribal self-government' is at the heart of tribal jurisdiction." *Smith v. Salish Kootenai Coll.*, 434 F3d 1127, 1133 [33 Indian L. Rep. 2026] (9th Cir. 2006) (en banc) (quoting *Montana*, 450 U.S. at 564, 101 S. Ct. 1245), *cert denied,* 547 U.S. 1209, 126 S. Ct. 2893, 165 L. Ed. 2d 922 (2006).

Although the issue in the *Montana* case was about tribal regulatory authority over nonmember fee land within the reservation, *Montana*, 450 U.S. at 547, 101 S. Ct. 1245, *Montana's* analytic framework now sets the outer limits of tribal civil jurisdiction – both regulatory and adjudicatory – over nonmember activities on tribal trust and nonmember fee land. The Supreme Court held in *Strate v. A-1 Contractors* that "[a]s to nonmembers . . . a tribe's adjudicative jurisdiction does not exceed its legislative jurisdiction." *Strate*, 520 U.S. at 453, 117 S. Ct. 1404.

5

Tribal court jurisdiction thus "turns upon whether the actions at issue in the litigation are regulable by the tribe." *Hicks*, 533 U.S. at 367 n.8, 121 S. Ct. 2304. The Court has also indicated that "*Montana* applies to both Indian and non-Indian land." *Id.* at 360, 121 S. Ct. 2304; *see also id.* at 387, 121 S. Ct. 2304 (O'Connor, J., concurring in part) ("Today, the Court finally resolves that *Montana v. United States*, governs a tribe's civil jurisdiction over nonmembers regardless of land ownership.") (citation omitted); *MacArthur v. San Juan County*, 497 F.3d 1057, 1069-70 [34 Indian L. Rep. 2190] (10th Cir. 2007).

Because "efforts by a tribe to regulate nonmembers . . . are presumptively invalid," a Tribe, and here the Plaintiff, bears the burden of showing assertion of tribal court jurisdiction falls within one of the *Montana* exceptions. *Plains Commerce Bank*, 128 S. Ct. at 2720 (quotation marks omitted). Those exceptions are narrow ones and "cannot be construed in a manner that would "swallow the rule.'" *Id.* (quoting *Atkinson Trading Co.*, 532 U.S. at 655, 121 S. Ct. 1825).

Here, Plaintiff's cause of action is based upon a tribal regulation prohibiting termination, for any reason, of utility service five (5) months of each year "during the period of November 1st to April 1st." The ordinance, Title 20, Utilities, Crow Law and Order Code (CLOC)applies to "an electric cooperative, which furnishes electric service within the Crow Reservation." Sec 20-1-101(1).

Only if the Crow Tribe has authority to regulate Big Horn, thereby altering the written membership agreement between Big Horn and Plaintiff, (attached with affidavit) which requires payment for electric energy and services when due, does this Court have jurisdiction in this case. As stated in the *Strate* case, 520 U.S. at 453, 117 S. Ct. 1404, "a tribe's adjudicative jurisdiction does not exceed its

6

legislative jurisdiction."   When a nonmember's activities inside the reservation implicate the tribe's sovereign interests the tribe may regulate the activities. Reaching the conclusion whether the tribe has regulatory authority in this case requires analysis of a host of genuine issues of material fact.   Involved is a necessary inquiry whether Big Horn would even agree to be a party to a consensual relationship with the tribe and its members in the face of enforcement of the regulation, and, whether enforcement of the regulation is necessary to protect certain tribal sovereign interest.

   *Montana's* first exception is limited to "activities of nonmembers" 450 U.S. at 565, 101 S. Ct. 1245, regulation of which is allowed only as necessary "to protect tribal self-government [and] to control internal relations." *Plains Commerce Bank*, 35 ILR 1015, citing *Big Horn County Electric, Inc. v. Adams*, 219 F.3d 944, 951 (9th Cir. 2000).

> Montana does not grant a tribe unlimited regulatory or adjudicative authority over a nonmember.   Rather, *Montana*, limits tribal jurisdiction under the first exception to the regulation of the *activities* of nonmembers" (internal quotations omitted; emphasis added)).

35 ILR at 1015.

   In support of the first *Montana* exception giving tribal jurisdiction over "activities" of nonmembers, the Supreme Court in *Montana* cited four cases.   The first, *Williams v. Lee, supra*, involved a tribal court suit brought by a non-Indian over a contract dispute arising from a sale of goods to a tribal member on the reservation.   The other three cases involved taxes associated with reservation based "activities" in which the tribe had an interest in the subject matter; (1) grazing livestock on trust land, (2) activities on trust land, and (3) severance tax on trust mineral production.   In each tax case, the Court concluded the non-Indians'

7

right to engage in the "activities" on the reservation were conditioned upon payment of the tax.  In other words, regulatory authority, in the form of taxation, flows directly from a tribe's power to exclude i.e. deny the non-Indian the right to engage in the reservation based activity unless the condition, payment of tax, is satisfied.

Here, no similar circumstances exist.  There is no contract dispute between Plaintiff and Big Horn as in *Williams v. Lee*, nor voluntary submission to tribal court jurisdiction as in that case.  This case involves tribal interference in the contractual relations between Plaintiff and Big Horn which have nothing whatsoever to do with the tribe's right of self-government and right to control internal relations between the tribe and its members.  See, *Hicks, supra*, at 361, 121 S. Ct. 2304.  (Tribal assertion of regulatory authority over nonmembers must be connected to that right of the Indians to make their own laws and be governed by them.)

One thing we know, even though Plaintiff's brief alleges the regulation "is designed to protect the health and safety of elderly and disabled tribal members . . . ," (Plaintiff's Brief p. 3.) the second *Montana* exception does not apply here.  The United States Supreme Court, in the *Plains Commerce Bank* case, clarified its limited application stating:

> The second exception authorizes the tribe to exercise civil jurisdiction when non-Indians' "conduct" menaces the "political integrity, the economic security, or the health or welfare of the tribe." *Montana*, 450 U.S. at 566, 101 S. Ct. 1245.  The conduct must do more than injure the tribe, it must "imperil the subsistence" of the tribal community. *Ibid*.  One commentator has noted that "th[e] elevated threshold for application of the second *Montana* exception suggests that tribal power must be necessary to avert catastrophic consequences." *Cohen* § 4.02[3][c], at 232, n.220.

35 ILR at 1017.

By contrast, it is submitted the "conduct" of Big Horn, in furtherance of operation of the member owned electric cooperative, enhances the health and welfare of the tribal community.

## CONCLUSION

Thus, in order to prevail, Plaintiff must show through admissible facts that the tribe has the legislative power to exclude Big Horn from engaging in activities on the reservation and set conditions on entry to the land, in the form of the regulation here at issue, justified as necessary to preserve self government and territorial management. *Plains Commerce Bank*, 35 I.L.R. @ 1015, citing *Merrion*, 455 U.S. at 137.

Agreements in the form of Plaintiff's Membership Agreement are authorized by federal law and regulation found at 25 CFR § 169.22(a).  The federal purpose trumps tribal regulation, as follows:

> (c) In order to encourage the use of telephone, water, electric power, gas and other utilities and to facilitate the extension of these modern conveniences to sparsely settled Indian areas without undue costs the agreement referred to in paragraph (a) of this section shall only be required to include or have appended thereto, a plat or diagram showing with particularity the location, size, and extent of the line.

25 CFR § 169-22(c) at 469.

The Supreme Court, in cases cited above, has repeatedly stated tribal adjudicatory authority does not exceed its legislative authority.

Clearly, as there are many genuine issues of material fact not now before the Court, Plaintiff's Motion must be denied and in addition the case should be dismissed because the Court lacks jurisdiction in this case.

RESPECTFULLY SUBMITTED this 23rd of July, 2012.

9

JAMES E. TORSKE

## CERTIFICATE OF SERVICE

This is to certify that the foregoing Defendant's Response to Plaintiff's Motion for Summary Judgment was duly served by first class mail, postage prepaid, this 23rd day of July, 2012, upon the following interested party:

Joe Hardgrave
Montana Legal Services Association
2442 1st Avenue North
Billings, Montana  59101

By: James E. Torske

10

James E. Torske
314 North Custer Avenue
Hardin, Montana, 59034
406-665-1902
Attorney for Defendant

## IN THE CROW TRIBAL CIVIL COURT
## IN AND FOR THE CROW INDIAN RESERVATION
### PO BOX 489
### CROW AGENCY, MONTANA, 59022
### (406) 638-7400; FAX (406) 638-7415

ALDEN BIG MAN,        )  **CIVIL CASE NO. 2012-118**
                         )
       Plaintiff,     )
                         )  **AFFIDAVIT OF CASEY MUNTER**
   v.             )
                         )
BIG HORN COUNTY ELECTRIC )
COOPERATIVE, INC., a      )
Montana Corporation,     )
                         )
       Defendant.   )
_____)

STATE OF MONTANA    :
                    :ss.
County of Big Horn    )

COMES NOW, CASEY MUNTER, Manager of Big Horn County Electric Cooperative, Inc., and after first being duly sworn, states as follows:

1.  Affiant is the current Manager of Big Horn County Electric Cooperative, Inc., (Big Horn) a member owned cooperative incorporated under the laws of the State of Montana with corporate offices located in Hardin, Montana.

2.  Big Horn engages in the business of delivering electrical services and energy in the State of Montana and Northern Wyoming. Portions of the Crow Indian Reservation and Northern Cheyenne Indian Reservation are within the area served by Big Horn.

1

3.  Big Horn does not maintain records which would reflect the number of enrolled members of Indian tribes who are cooperative members of Big Horn.

4.  Alden Big Man is a member of Big Horn and a true copy of his Membership Agreement is attached hereto as Exhibit A.

5.  In addition to the Membership Agreement, Big Horn's Bylaws and Written Policy No. 26, attached hereto as Exhibit B, require Big Horn's members to pay bills for energy consumed in a timely manner.

6.  Policy No. 26 provides in part that in event a cooperative member is unable to pay a current bill the cooperative may approve a payment schedule.

7.  Plaintiff Alden Big Man did not request a payment plan for his bill due in January, 2012.

FURTHER AFFIANT SAYETH NOT.

DATED this 23rd day of July, 2012.

_____
CASEY MUNTER
Manager
Big Horn County Electric
Cooperative, Inc.

STATE OF MONTANA      )
                      :ss.
County of Big Horn    )

On this 23rd day of July, 2012, before me, the undersigned, a Notary Public in and for said state, personally appeared Casey Munter, known to me to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same, for the purposes therein expressed.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day and year first hereinabove written.

_____
Printed Name: _____
Notary Public for the State of Montana
Residing at: _____
My Commission Expires: _____

JAMES E TORSKE
Notary Public for the
State of Montana
Residing at Hardin, Montana
My Commission Expires
November 01, 2014

SEAL

2

Exhibit A

PAID

| | Filing Fee (Not Refundable) | | NAME OF APPLICANT(S) |
|---|---|---|---|
| $ | 5.00 | Membership Fee (Refundable) FEB 1 5 1999 | ALDEN BIG MAN |
| $ | 50.00 | Consumer's Deposit (Refundable) | PO BOX 271 |
| $ | 168.00 | Minimum Bill Prepayment | CROW AGENCY    MT    59022 |
| $ | 7.50 | Records Fee (Not Refundable) B.H.C.E.C. | |
| $ | 230.50 | Total Amount Due in Advance | |

## APPLICATION FOR MEMBERSHIP AND FOR ELECTRIC SERVICE

The undersigned, (hereinafter called "Applicant(s)") hereby applies for membership in and agrees to purchase electric energy from Big Horn County Electric Cooperative, Inc. (hereinafter called the "Cooperative") upon the following terms and conditions:

1. The Applicant(s) will pay the Cooperative the sum of $5.00, which if this application is accepted by the Cooperative will constitute the Applicant's (s) fee.

2. The Applicant(s) will, when electric energy becomes available purchase from the Cooperative all electric energy used on the premises described below and will pay therefore monthly rates to be determined from time to time in accordance with the by-laws of the Cooperative; provided however, that the Cooperative may limit the amount of electric energy to be fur-nished for industrial uses.  The Applicant(s) will pay a bill of at least $ 14.00 _____ per month, (or $ _____ per year), regardless of the number of kilowatt hours consumed.

3. The Applicant(s) will cause his (their) premises to be wired in accordance with the specifications approved by the Cooperative or the applicable state authority having jurisdiction.

NOT A COPY

4. The Applicant(s) will comply with, and be bound by the provisions of the articles of incorporation and by-laws of the Cooperative, and such rules and regulations as may be from time to time adopted by the Cooperative. The Applicant agrees that the laws of the State of Montana shall control and be exclusively applied for the purpose of determining the rights of the Cooperative and Applicant hereunder and the Montana Thirteenth Judicial District Court, Big Horn County shall have exclu-sive jurisdiction and venue for the purpose of actions or proceedings brought to determine the rights of either the Cooperative or the Applicant arising by reason of membership in the Cooperative or delivery of electric energy to said member or any or all rights arising by reason of this membership agreement, articles of incorporation or by-laws of the Cooperative.¶

5. The Applicant(s) by paying a membership fee and becoming a member, assumes no personal liability or responsibility for any debts or liabilities of the Cooperative, and it is expressly understood that under the law his (their) private property is exempt from execution for any such debts or liabilities.

The acceptance of this application by the Cooperative shall constitute an agreement between the Applicant(s) and his (their) successor or successors in interest, and the Cooperative and the contract for electric service shall continue in force for _____ from the date service is made available by the Cooperative to the Applicant(s), and thereafter until cancelled by at least thirty days written notice given by either party to the other.

The Applicant will grant the Cooperative easements, at no cost to the Cooperative, over lands owned by Applicant, for the purpose of extending the distribution system of the Cooperative to provide electric energy and services to Applicant and/or present or future members or customers of the Cooperative.

The Applicant(s) herein named, in order to guarantee, secure and assure the payment of any and all indebtedness which is due at the date hereof or which may hereafter become due and payable from the Applicant(s) to the Cooperative or from (his) (her), (its) lessee(s) or assignee(s) for any electrical energy or service delivered or furnished or any other indebtedness caused or incurred because of the performance under this agreement by the Cooperative, does hereby grant to the Cooperative a specific lien upon and against the real property herein described for the indebtedness incurred to the payable to the Cooperative from said Applicant(s) and said Lessee(s) or Assignee(s) with interest thereon at the rate of Ten (10) percent per annum from the date of accrual of said indebtedness which shall be incurred, caused and become payable to the Cooperative and it is specifically agreed by and between the parties hereto that such specific lien shall be subject to enforcement and may at the option of the Cooperative, be enforced by foreclosure immediately upon said indebtedness becoming unpaid or delinquent or at any time thereafter and said specific lien shall be enforced in the

The foregoing application for membership accepted this _____ 15th _____ day of

_____ February _____, 1999

BIG HORN COUNTY ELECTRIC COOPERATIVE, Inc.

By _Hale C. Jeffers_

Hale C. Jeffers, Secretary/Treas.

STATE OF MONTANA. } ss.

County of Big Horn.

On this ____ 15TH ____ day of ____ FEBRUARY ____, before me, ____ TIM R. GREGORI ____

a Notary Public for the State of Montana, personally appeared ____ ALDEN BIG MAN ____

known to me to be the person who subscribed his name to the within and foregoing instrument and acknowledged to me that

he (she) executed the same.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my Notarial Seal the day and date hereinbefore

written.

_Tim R. Gregori_

Notary Public for the State of Montana

Residing at:   HARDIN   MT

My Commission Expires:   20-DEC-02

BIG HORN COUNTY ELECTRIC COOPERATIVE, INC.

## Policy No. 26

SUBJECT:                    Delinquent accounts

### Billing Conditions:

All bills are to be paid prior to the 10th day of the month following the billing period, except for closing bills, bills with a previous balance and delinquent bills which are due upon presentation. A consumer who anticipates being away from their residence for a prolonged period of time (a complete billing cycle) is responsible for depositing with the Cooperative sufficient funds to cover anticipated billings that will be issued during the consumers period of absence. A consumer who questions or disputes a bill is encouraged to contact the Cooperative before collection efforts become necessary to avoid service interruptions.

It shall be the responsibility of the consumer to keep the Cooperative informed of their current mailing address which is to be used for all business correspondence.

### Payment Schedule/Arrangements for Consumers Subject to Disconnect From October Through April:

A consumer who is unable to pay their current bill in full may enter into a Cooperative approved payment schedule. A consumer's eligibility to enter into a payment schedule will be based on their demonstrated good faith in paying their monthly bill, ability to pay, and performance on previously arranged payment schedules. A consumer who has not kept prior payment commitments with the Cooperative may not be permitted to enter into a new payment arrangement for one year. Payment schedules will not usually exceed 60 days and are to be paid in addition to all current billings. Acceptance of partial payments and approval of payment schedules does not preclude the Cooperative from requiring full payment for outstanding accounts on demand.

### Medical Emergencies:

Service will not be disconnected for non-payment when it has been verified that life-support equipment is in service and the disconnection of service would seriously jeopardize the physical welfare of an occupant of the household. In order to qualify for a medical exemption from disconnection the Cooperative must be notified in writing by a licensed physician that disconnection of the electric service would seriously endanger the consumers health or that of a member of the immediate household.

31

A consumer avoiding disconnection due to a medical emergency will be given 30 days to make suitable payment arrangements with the Cooperative. If the consumer fails to contact the Cooperative, and make payment arrangements that will result in the account becoming current within 60 days, the account is subject to disconnect.

Payments and Service Charges:

The Cooperative reserves the right to designate the means or form of payment (cash, money order, bank cashiers check, etc.) from any consumer. A consumer who has previously tendered an un-honored check as payment for their account may be required to pay with cash, money order or cashiers check. A service charge will be assessed to cover the cost of collection efforts, processing checks returned by the bank for insufficient funds, notices hand delivered by field representatives, and the disconnect/reconnect of services.

The Cooperative will charge the consumer $20, plus bank fees, to process checks returned by the bank for insufficient funds or closed accounts. The Cooperative will charge the consumer $100 if it must dispatch an employee to collect payment or disconnect a delinquent service. The Cooperative will charge an additional $50 to reconnect a consumer service that has been disconnected for nonpayment.

Accounts that are disconnected for non-payment may be subject to an additional deposit to bring the deposit amount up to the minimum deposit required.

The Cooperative will make every effort to reconnect the service on the same day of payment, however, if payment is made at such time as the Cooperative cannot reconnect the service during normal business hours the service will be reconnected the next business day.

A consumer wishing to have a service reconnected after hours, on weekends or holidays, will pay a minimum of two hours overtime pay to have an employee(s) called out to reconnect their service. Restoration of service after hours will require management approval and all reconnect fees will be paid to field personnel prior to reconnecting the service.

It shall also be the established policy of the Cooperative, that any consumer who reconnects or tampers with a service that has been disconnected will be assessed a fee of $200 in addition to the total amount of the bill together with associated collection and reconnect fees. (The account may also be charged an additional deposit.) These charges must be paid before the service is restored. The Cooperative reserves the right to prosecute for power diversion or theft.

Policy No. 26 Continued

Disconnect/Reconnect of Delinquent Accounts:

The Cooperative will make every reasonable effort to secure payment of all delinquent accounts receivable. When deemed necessary by the Cooperative delinquent accounts will be limited or disconnected for nonpayment.

Prior to disconnecting a service for nonpayment the following notification procedure will be followed:

A.   A monthly bill will be mailed to all consumers informing them their account is due upon receipt. Past due information will be noted on monthly bills if full payment has not been received for prior billing periods.

B.   If payment is not received within ten days of the billing notice, the Cooperative will:
(1)   Apply the 5% penalty to the delinquent account record.
(2)   For the accounts more than thirty days past due, send a termination of service letter postmarked at least 10 days prior to the date of the proposed service termination.

C.   If the consumer has not brought his/her account current by the time a Cooperative employee is on location on the pre-determined disconnect date, the service may be terminated. The consumer will be notified that the service has been terminated.

D.   Service discontinued or suspended for default or delinquent payment shall not be resumed at the service address until all charges have been paid in full.

Returned Checks:

If a consumer tenders an insufficient funds check or closed account check in payment of a delinquent account the consumer will be notified by first class mail that a $20 charge, plus bank fees, has been added to the account. The service will be disconnected five days from the postmarked date of the notification unless the account is paid in full along with the applicable service charges.

Multiple Accounts:

It shall be the established policy of the Cooperative that any member or consumer having more than one service account, and having delinquency of payment in one or more of their electric service accounts, then each and all electric service accounts of that consumer shall be deemed delinquent. After written notice has been sent to the consumer, in accordance with this policy, and default payment exists on any one of their multiple electric service accounts, the Cooperative shall discontinue electric service to each and all the consumers electric service accounts as prescribed in the notifications of service curtailment.

(Adopted 08/11/53)
(Revision Approved Special Meeting 07/16/62)
(Revised 5/14/63, 12/10/63, 11/10/64)
(Revised, Board Meeting 04/75, effective 06/10/75)
(Revised, Board Meeting 11/11/80, effective 12/80)
(Revision Approved, Regular Board Meeting 07/09/85)
(Revision Approved, Regular Board Meeting 10/08/91)
(Revision Approved, Regular Board Meeting 07/08/97)
(Revision Approved, Regular Board Meeting 07/14/98)
(Revision Approved, Regular Board Meeting 09/10/02)
(Revision Approved, Regular Board Meeting 07/08/03)
(Revision Approved, Regular Board Meeting 12/09/03)
Approved as written, Regular Meeting 05/18/04.
Approved as written, Regular Meeting 03/21/06.
Approved as written, Regular Meeting 07/18/06.
Approved as written, Regular Meeting 11/20/07.
Approved as written, Regular Meeting 02/15/2011.

James E. Torske
314 North Custer Avenue
Hardin, Montana, 59034
406-665-1902
Attorney for Defendant

**IN THE CROW TRIBAL CIVIL COURT**
**IN AND FOR THE CROW INDIAN RESERVATION**
**PO BOX 489**
**CROW AGENCY, MONTANA, 59022**
**(406) 638-7400; FAX (406) 638-7415**

| | |
|---|---|
| ALDEN BIG MAN,      ) | **CIVIL CASE NO. 2012-118** |
|                  ) | |
|        Plaintiff,    ) | |
|                  ) | **DEFENDANT'S** |
|     v.             ) | **RESPONSE** |
|                  ) | |
| BIG HORN COUNTY ELECTRIC ) | |
| COOPERATIVE, INC., a      ) | |
| Montana Corporation,       ) | |
|                  ) | |
|        Defendant.   ) | |

COMES NOW, BIG HORN COUNTY ELECTRIC COOPERATIVE, INC., (hereinafter Big Horn), the defending party, by and through its counsel of record, JAMES E. TORSKE, and hereby submits Defendant's Response.

Plaintiff's basic premise, that the theories used to exercise jurisdiction over Big Horn in *Harris v. Big Horn County Electric*, No. 86-223 (Crow Tr. Ct., Dec 9, 1986) apply to establish jurisdiction in this case, is unquestionably flawed.

Over the twenty-six (26) years since the *Harris* decision the United States Supreme Court and Federal Circuit Courts have decided case after case defining the extent of tribal court jurisdiction over the activities of non-tribal members, thus collectively rendering the *Harris* case no longer good law upon which this court may rely to establish jurisdiction in this matter.

1

Big Horn may not be characterized in any manner other than a "non-member".  It is a Montana corporation, incorporated under the "Rural Electric and Telephone Cooperative Act", M.C.A. § 35-18-101, et seq.   The conduct of its business is regulated under the provisions of that act.

One must pause only momentarily to consider whether there is any real, justifiable reason for the Crow Tribe to also regulate the "activities" or "conduct" of Big Horn to reach the conclusion – there is none.   Why?   Because Big Horn's activities do not "intrude on the internal relations of the tribe or threaten tribal self rule."   *Plains Commerce Bank v. Long Family Land & Cattle Co.*, 128 S. Ct. 2709, 35 Indian L. Rep. 1011, 1015 (2008).  Only "[t]o the extent they do, such activities or land uses may be regulated" *Id.*

Circumstances under which tribal regulation may be justified is clarified in *Nevada v. Hicks*, 533 U.S. 353, 361 (2001), and cited in *Plains Commerce Bank* at 1015:

> "Tribal assertion of regulatory authority over nonmembers must be connected to that right of the Indians to make their own laws and be governed by them").  Put another way, certain forms of nonmember behavior, even on non-Indian fee land, may sufficiently affect the tribe as to justify tribal oversight.  While tribes generally have no interest in regulating the conduct of nonmembers, then, they may regulate nonmember behavior that implicates tribal governance and internal relations. (Emphasis added.)

Again, in *Plains Commerce Bank, supra*, the U. S. Supreme Court cited *Big Horn County Elect. Cooperative, Inc., v. Adams*, 219 F.3d 944, 951 (27 Indian L. Rep. 2207 (9th Cir. 2000) as follows:

> Montana does not grant a tribe unlimited regulatory or adjudicative authority over a nonmember.  Rather *Montana* limits tribal jurisdiction under the first exception to the regulation of the *activities* of nonmembers" (internal quotations omitted; emphasis added)).

2

Since the Supreme Court's decision in *Montana v. United States*, 450 U.S. 544, 8 Indian L. Rep. 1005 (1981), in all cases where federal courts have recognized tribal jurisdiction over non-Indian "activities" on a reservation, those activities must have a discernible negative effect on the tribe or its members. *Plains Commerce Bank, supra*.   The non-Indian conduct must threaten tribal self rule. *Id.  See Nevada v. Hicks* at 361, 121 S. Ct. 230.

Here, Big Horn's "activities" or "conduct" involves only its effort to require Plaintiff to perform the conditions of his membership agreement, the same agreement which binds and obligates all Big Horn's members to pay for electric energy delivered.  Without compliance with this condition by Big Horn's members, Big Horn would be unable to continue delivery of energy to its members functionally putting it out of business.

In *Attorney's Process and Investigative Services, Inc. v. Sac and Fox Tribe of the Mississippi in Iowa*, 37 Indian L. Rep. 2205 (2010), the Eighth Circuit Court made it clear under the current state of the law the tribal court must consider the functional effect of tribal regulation upon a nonmember and the tribe as well.

> *Plains Commerce Bank* thus demonstrates that courts applying *Montana* should not simply consider the abstract elements of the tribal claim at issue, but must focus on the specific nonmember conduct alleged, taking a functional view of the regulatory effect of the claim on the nonmember.
> This approach is illustrated in decisions of other courts.   For example, in *Elliot v. White Mountain Apache Tribal Court*, 566 F.3d 842, 849 [36 Indian L. Rep. 2113] (9th Cir. 2009), the Ninth Circuit considered the extent of the alleged damage before deciding that a tribe had colorable jurisdiction to enforce regulations prohibiting trespass and requiring a permit to make a fire on tribal land.   The court noted that "the regulations at issue are intended to secure the tribe's political and economic well-being, particularly in light of the result of the alleged violations of those regulations in this very case: the destruction of millions of dollars of the tribe's natural resources." *Id.* at 850.   The court's decision thus did not rest solely on the

categorical elements in the tribal regulations, but on "the circumstances of this case." *Id.*

## CONCLUSION

To be frank, yes, Big Horn's activities have an effect upon both the tribe and its members. But, that effect is not negative but is that which is recognized in 25 C.F.R. § 169-22(c) as the "extension of these modern conveniences (utilities) to spacely settled Indian areas without undue costs.", a positive effect.

Tribal oversight is not necessary or appropriate to alter the contractual relationship between Big Horn and its member owners. Big Horn's activities in no way hinder or threaten tribal self rule.

Summary judgment must not be granted Plaintiff.

RESPECTFULLY SUBMITTED this 4th of December, 2012.

JAMES E. TORSKE

## **CERTIFICATE OF SERVICE**

This is to certify that the foregoing Defendant's Response was duly served by first class mail, postage prepaid, this 4th day of December, 2012, upon the following interested party:

Joe Hardgrave
Montana Legal Services Association
2442 1st Avenue North
Billings, Montana  59101

By: James E. Torske

4