IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| BIG HORN COUNTY ELECTRIC COOPERATIVE, INC., | CV 17-65-BLG-SPW-TJC |
| Plaintiff, | |
| vs. | **FINDINGS AND RECOMMENDATIONS OF U.S. MAGISTRATE JUDGE** |
| ALDEN BIG MAN, *et al*, | |
| Defendants. | |

Plaintiff Big Horn County Electric Cooperative, Inc. ("BHCEC") filed this action against Defendant Alden Big Man ("Big Man"), together with several Judges and Justices of the Crow Tribal Courts and Unknown Members of the Crow Tribal Health Board ("Tribal Defendants"), in response to a civil action brought by Big Man against BHCEC in Crow Tribal Court. (Doc. 1.) Big Man's suit alleged BHCEC violated the Crow Law and Order Code section restricting the termination of electric service during winter months. (*See* Doc. 1-2.) BHCEC now seeks declaratory and injunctive relief to bar the prosecution of Big Man's action in Tribal Court. (Doc. 1.)

All parties have filed motions for summary judgment. (Docs. 83, 84, 87.) Responses and replies have been filed and the matter is fully briefed. (Docs. 99,

100, 102, 104-106.)  Having considered the parties' submissions, the Court recommends BHCEC's motion be DENIED; the Tribal Defendants' motion for summary judgment should be GRANTED; and Big Man's motion should be GRANTED on the issue of whether the BHCEC/Big Man membership agreement constituted a waiver of the Crow Tribe's sovereign power to regulate BHCEC.

## I.     Factual Background

The Crow Indian Tribe's territory in Montana was originally recognized in the First Treaty of Fort Laramie of 1851 as consisting of approximately 38.5 million acres.  *Montana v. U.S.*, 450 U.S. 544, 548 (1981).  When the Crow Reservation was later established in the Second Treaty of Fort Laramie in 1868, however, it consisted of approximately 8 million acres.  *Id.*  Subsequent Acts of Congress further reduced the size of the reservation to less than 2.3 million acres.  *Id.*

The ownership of the lands on the reservation was also fragmented by the General Allotment Act of 1887, ch. 119, 24 Stat. 388, and the Crow Allotment Act of 1920, 41 Stat. 751.  *Id.*  Those Acts authorized patents in fee to be issued to individual Indian allottees on the reservation.  *Id.*  After holding the land for 25 years, the allottees could then alienate the land to non-Indians.  *Id.*  This has resulted in a patchwork of land owned by the Tribe, by individual members of the Tribe, and by non-Indians.  At the time of the *Montana* decision in 1981,

approximately 52 percent of the reservation was allotted to members of the Tribe and held in trust by the United States; 17 percent was held in trust for the Tribe; 28 percent was owned in fee by non-Indians; and 2 percent was owned by the State of Montana and less than 1 percent by the United States.  *Id.*

BHCEC is a non-Indian, non-tribal entity that delivers electrical services in Southeastern Montana and Northern Wyoming, including to customers on the Crow Indian Reservation.  (Doc. 101 at ¶ 1.)  The Ninth Circuit has previously noted that BHCEC is the primary provider of electrical services on the reservation, serving more than 1,700 customers within its boundaries.  *Big Horn County Elec. Co-op, Inc. v. Adams*, 219 F.3d 944, 948 (9th Cir. 2000).  The Tribe and its members constitute approximately half of BHCEC's total membership.  *Id.*

Big Man is an enrolled member of the Crow Tribe, and lives on land leased from the Tribe.  (Docs. 101 at ¶ 2; 116 at ¶¶ 2, 7.)  The land is owned by the Tribe and held in trust by the United States.  (Doc 116 at ¶¶ 2, 7; 114-3 at 4.)  Big Man has received electrical service to his residence from BHCEC since 1999.  (Docs. 73 at ¶ 4; 101 at ¶ 2.)  To establish electrical service, Big Man signed a BHCEC Application for Membership and for Electrical Service, which contains a choice of law provision.  (Docs. 1-6; 101 at ¶¶ 2-3.)  The provision stated that Montana law would control in determining the rights of the parties to the agreement, and it

3

designated the state district court in Big Horn County to have exclusive jurisdiction over any legal proceeding.  (Doc. 1-6.)

In January 2012, Big Man was delinquent on his account with BHCEC. (Docs. 101 at ¶ 6; 103 at ¶ 6.)  BHCEC gave Big Man a termination notice on January 11, 2012 and disconnected his service on January 26, 2012.  (Docs. 101 at ¶ 7; 103 at ¶ 7.)  Big Man subsequently sought relief in Tribal Court under Title 20, Chapter 1 of the Crow Law and Order Code, which restricts the termination of electrical service during winter months except with notice and specific prior approval of the Tribal Health Board.  (Doc. 1-2.)  Big Man alleged BHCEC's notice was improper and lacked approval of the Board.  (*Id.* at 3.)

The Crow Trial Court dismissed Big Man's lawsuit for lack of jurisdiction, but the Crow Court of Appeals reversed and remanded, holding jurisdiction existed over BHCEC to enforce Tribal law.  (Docs. 1-4; 1-5; 1-7.)  BHCEC then filed the instant suit, seeking a declaratory judgment that "the Tribal Court lacks subject matter and personal jurisdiction over [BHCEC] in [Big Man's] Lawsuit."  (Doc. 1 at ¶ 38.)  BHCEC also seeks an injunction prohibiting Defendants "from prosecuting and maintaining the [Big Man] Lawsuit in Tribal Court against [BHCEC].  (*Id.* at ¶ 43.)

*/ / /*

## II.    Legal Standard

Summary judgment is appropriate where the moving party demonstrates the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Material facts are those which may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable factfinder to return a verdict for the nonmoving party.  *Id*.  "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

The moving party bears the initial burden of establishing the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.  If the moving party fails to discharge this initial burden, summary judgment must be denied, and the court need not consider the non-moving party's evidence. *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 159-60 (1970).

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  In attempting to establish the existence of this factual dispute, the opposing party must "go beyond the pleadings and by 'the depositions, answers to

interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)). The opposing party cannot defeat summary judgment merely by demonstrating "that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586; *Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995) ("The mere existence of a scintilla of evidence in support of the nonmoving party's position is not sufficient.") (citing *Anderson*, 477 U.S. at 252).

When making this determination, the Court must view all inferences drawn from the underlying facts in the light most favorable to the non-moving party. *See Matsushita*, 475 U.S. at 587. "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, [when] he [or she] is ruling on a motion for summary judgment." *Anderson*, 477 U.S. at 255.

When parties file cross-motions for summary judgment, the Court reviews each motion on its own merits. *Fair Housing Council of Riverside Cty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001).

When reviewing a decision of an Indian tribal court regarding jurisdictional issues, questions of law are reviewed de novo, while the clearly erroneous standard is applied to factual questions. *Big Horn County Electrical Co-op, Inc. v. Adams*,

219 F.3d 944, 949 (9th Cir. 2000) ("Questions about tribal jurisdiction over non-Indians is an issue of federal law reviewed de novo.")

## III.   Discussion

The underlying issue common to BHCEC and Tribal Defendants' motions for summary judgment is whether, and to what extent, the Crow Tribe has legislative and adjudicative authority over BHCEC, a non-Indian entity.  BHCEC argues that the Crow Tribe has neither legislative nor adjudicative jurisdiction over its on-reservation operations.  (Doc. 83-4 at 8.)  Tribal Defendants argue that the Tribe has the authority to regulate BHCEC activities on the reservation, and that BHCEC is subject to the Crow Tribal Court's jurisdiction of Big Man's claim. (Doc. 88 at 17.)

Big Man defers to Tribal Defendants' arguments on the jurisdictional issue and instead focuses his motion for summary judgment on the enforceability of BHCEC's membership application.  (Doc. 85 at 2.)

The Court will first address tribal jurisdiction and then turn to the enforceability of BHCEC's membership application.

### A.   Tribal Jurisdiction

The Ninth Circuit "has long recognized two distinct frameworks for determining whether a tribe has jurisdiction over a case involving a non-tribal-member defendant." *Window Rock Unified District v. Reeves*, 861 F.3d 894, 898

(9th Cir. 2017).  The distinction is based on the status of the land.  If the nonmember conduct occurs on tribal land, a tribe's right to exclude generally "imparts regulatory and adjudicative jurisdiction over conduct on that land."  *Id.* at 899.  The Ninth Circuit has recognized that "because tribes generally maintain the power to exclude and thus to regulate nonmembers on tribal land, tribes generally also retain adjudicative jurisdiction over nonmember conduct on tribal land."  *Id.*

With respect to non-tribal land, however, a tribe does not generally possess the right to regulate non-member conduct, even if the land falls within the boundaries of the reservation.  *Id.*  To exercise regulatory or adjudicative authority on non-tribal land, the case must fall within two exceptions to the general rule established in *Montana v. United States*, 450 U.S. 544 (1981).  First, "[a] tribe may regulate, through taxation, licensing, or other means, the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases or other arrangements."  *Montana*, 450 U.S. at 565.  Second, "[a] tribe may . . . retain inherent power to exercise civil authority over the conduct of non-Indians on fee lands within its reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe."  *Id.* at 566.

BHCEC asserts that the Crow Tribe does not have the right regulate its activities under either framework.  First, while BHCEC concedes that Big Man's

8

home is situated on Tribal trust land, it nevertheless contends that the right to exclude does not exist.  (Docs. 83-4 at 16; 116 at ¶ 2.)  BHCEC argues that the General Allotment Act of 1887 and the Crow Act of 1920 divested the Crow Tribe of absolute and undisturbed use and occupation of reservation lands by virtue of allotment, thus any regulatory authority predicated on the Tribe's right to exclude was likewise divested.  (Doc. 83-4 at 16.)  Second, BHCEC argues it did not give implicit consent to Tribal jurisdiction under the first *Montana* exception, because there is no nexus between any consensual relationship and the regulation at issue. (*Id.* at 17-19, 22-23.)  Last, BHCEC asserts its conduct on fee lands within the Crow Reservation does not imperil the Crow Tribe, thus the second exception under *Montana* does not apply.  (*Id.* at 27.)

The Tribal Defendants counter that it has the power to regulate BECEC's conduct on Big Man's land under each available avenue.  They contend that (1) Big Man's residence is located on Tribal lands and the Tribe retains the right to exclude; (2) BHCEC entered into a consensual relationship with the Tribe by entering into contracts with its members and voluntarily providing electrical services on the reservation; and (3) the termination of residential electrical services during the winter months in Montana has a direct effect on the health and welfare of the Tribe.  (Docs. 88 at 17-32.)

/ / /

9

### 1. Right to Exclude

As discussed above, the right to exclude is one of two frameworks employed to determine tribal jurisdiction over a non-tribal member's conduct on tribal land. *Window Rock*, 861 F.3d at 898. The general rule is that "absent contrary provisions in treaties or federal statutes, tribes retain adjudicative authority over nonmember conduct on tribal land – land over which the tribe has the right to exclude." *Id.*

The Court previously found that the record was insufficient to determine the location and land status of Big Man's residence and ordered the parties to submit supplemental statements of fact with supporting documents. (Doc. 112.) The submissions included two U.S. Department of the Interior, Bureau of Indian Affairs ("BIA") documents for the Big Man property, which is designated as Allotment No. T-7011-W: the Homesite Lease and a partial Title Status Report. (Docs. 114-2 at 4; 114-3 at 4.) Plaintiff also submitted the BIA metes and bounds description referenced in Big Man's Homesite Lease, and subsequently submitted the complete BIA Title Status Report for the tract. (Docs. 124; 128; and 128-1.)

In reviewing the submitted materials, the Court finds that Big Man's property is designated tribal trust land. (*See* Doc. 114-3 at 4-6.) The BIA Title Status Report shows that the owner of Tract 7011-W is the Crow Tribe, and that title is held in trust by the United States. (*Id.*) The report further reflects that the

10

entire tract is held in trust, with ".0" percent held in fee.  (*Id.*)  Therefore, in the
absence of a treaty provision or federal statute to the contrary, the Tribe retains
regulatory and adjudicative authority over nonmember conduct on this land.

BHCEC argues, however, that the effect of the General Allotment Act of
1887 and the Crow Allotment Act of 1920 – whereby certain lands were allotted to
individual Tribal members and some tracts subsequently sold to non-Indians –
divested the Crow Tribe of absolute and undisturbed use and occupation of
reservation lands.  (Docs. 83-4 at 15-16.)  Thus, BHCEC contends any regulatory
authority predicated on the Tribe's right to exclude non-members was divested.
(*Id.* at 16.)

The Court disagrees.  BHCEC offers no authority for the proposition that a
tribe is divested of its right to exclude nonmembers from tribal lands because
certain areas of the reservation are held in trust for individual members or owned
by non-Indians.  While the federal government can limit a tribe's power by treaty
or statute, "[i]n interpreting the extent of any such limits, courts do not 'lightly
assume that Congress . . . intend[ed] to undermine Indian self government.'"
*Window Rock*, 861 F.3d at 899 (quoting *Iowa Mutual Ins. Co. v. LaPlante*, 480
U.S. 9, 18 (1987).  Thus, a presumption of civil jurisdiction over non-Indian
activities on tribal land lies "unless affirmatively limited by a specific treaty
provision or federal statute."  *Iowa Mutual Ins. Co.*, 480 U.S. at 18.  There is

11

nothing in the General Allotment Act or Crow Allotment Act which specifically limits the Crow Tribe's civil jurisdiction over non-Indian activities on Tribal land.

In its reply, and with its supplemental filings, BHCEC also argues that Tract 7011-W is located within a tract of land that was withheld from allotment in the Crow Allotment Act of 1920, and reserved for agency, school, cemetery, or religious purposes.[1]  (Doc. 113-1 at 3.)  Title to the land was to be held by the United States in trust "for the benefit of the tribe."  (*Id.*)  BHCEC argued in briefing and at oral argument that because the land was reserved for a specified public purpose, the Crow Tribe had no right to exclusively occupy the land or exclude Big Horn.  (Docs. 104 at 7; 127.)  Again, however, BHCEC offers no authority to support its argument that a tribe loses its right to exclude – and thus to regulate – non-Indians from tribal trust land which has been designated for a particular purpose.  BHCEC would have the Court establish a new land status subcategory for tribal trust lands and create an exception to the well-established

---

[1] Sections 5 and 17 of the Crow Allotment Act of 1920 reserved from allotment lands for the benefit of the tribe and in the public interest for such purposes as schools, cemeteries, religious institutions, administration, and townsites.  Crow Allotment Act, Pub. L. No. 239, §§ 5, 17, 41 Stat. 751, 753, 757 (June 4, 1920).  Section 5 emphasizes that reserved unallotted lands be "maintained for the benefit of the tribe," which comports with Big Man's property being held in trust.  *Id.* at 753 (*see also* Doc. 114-3 at 4).  Section 17 mandates that "patents shall be issued for the lands so set apart and reserved for school, park, and other purposes to the municipality or school district legally charged with the care and custody of lands donated for such purposes."  *Id.* at 757.

general rule that Indian tribes have the sovereign power to exclude non-tribal

members from tribal lands, as well as the jurisdiction to regulate conduct on that

land.  The Court declines to do so.  The Act's statutory provisions do not disturb

the Crow Tribe's absolute and undisturbed use and occupation of Tribal trust lands,

hence, its right to exclude.

BHCEC also argued during oral argument that BHCEC holds an easement

over Tribal lands for the purposes of providing electricity; thus, the Crow Tribe no

longer has the right to exclude it from Big Man's property.  (*See* Doc. 128-1 at 4.)

It follows in BHCEC's logic that because it is an easement holder and the Crow

Tribe does not have the right to exclude it from Big Man's property, then the Tribe

has waived its regulatory powers to enforce Title 20.  This argument also fails.

The Crow Tribe's authority to regulate and adjudicate derives from its

sovereign powers.  *Window Rock*, 861 F.3d at 899.  In *Window Rock*, the Ninth

Circuit reviewed U.S. Supreme Court precedent relating to tribal regulatory powers

and emphasized the Court's explanation in *Merrion v. Jicarilla Apache Tribe*, 455

U.S. 130 (1982):

> When a tribe grants a non-Indian the right to be on Indian land, the tribe
> agrees not to exercise its ultimate power to oust the non-Indian as long
> as the non-Indian complies with the initial conditions of entry.
> However, it does not follow that the lawful property right to be on
> Indian land also immunizes the non-Indian from the tribe's exercise of
> its lesser-included power to tax or to place other conditions on the non-
> Indian's conduct or continued presence on the reservation.

*Merrion*, 455 U.S. at 144-145; *Window Rock*, 861 F.3d at 899.  Here, Title 20's prohibition on terminating electrical service during winter months is clearly an "other condition on the non-Indian's conduct," separate and unrelated to BHCEC's easement over Tribal lands to provide electric service.  Thus, while the easement allows BHCEC's access to Tribal lands to provide electric service to Tribal members, Title 20 governs the termination of that same service on Tribal lands.

Finally, BHCEC argues that Title 20 of the Crow Law and Order Code, as written, applies to Tribal members and non-members, and Tribal lands and non-Tribal fee lands alike.  (Doc. 83-4 at 14.)  BHCEC argues that, since the scope of the section can extend beyond Tribal land and to nonmembers, it exceeds the Crow Tribe's jurisdictional authority under federal common law.  (*Id.*)  But the issue of whether the Crow Tribe has regulatory and adjudicative jurisdiction to apply this code section on non-Tribal fee lands is not before the Court.  BHCEC seeks to enjoin Big Man's lawsuit in Tribal Court, and the issue presented is whether the Crow Tribe has regulatory authority to enforce this provision on Big Man's residence on Tribal trust land, and whether the Tribal Court has adjudicative jurisdiction to enforce the provision on that land.  (*See* Doc. 1.)  To determine the issues presented by BHCEC's declaratory judgment action, it is not necessary to consider whether the Tribe's authority to regulate BHCEC's activities based on its

14

right to exclude would also extend to lands held in trust for individual members, by non-Indians, or by the state or federal government.

Therefore, the Court finds the Crow Tribe has regulatory and adjudicative jurisdiction over Big Man's Tribal trust property; has maintained the right to exclude BHCEC from Big Man's property; and has regulatory and adjudicative authority over BHCEC's conduct on that property.

### 2.    *Montana* Rule Exceptions

In addition, even if the Crow Tribe has been divested of the right to exclude from Big Man's tract of land, the Court further finds that the Tribe has the right to regulate BHCEC's activities under both *Montana* exceptions.

### a.    *Montana's* First Exception: Consensual Relationship

As discussed above, the first exception under *Montana* holds that a tribe may regulate the activities of nonmembers who enter consensual relationships with the tribe or its members. *Montana*, 450 U.S. at 565. This exception also requires "a nexus to the consensual relationship between the nonmember and the disputed commercial contacts with the tribe" in order to establish tribal jurisdiction over a nonmember. *Philip Morris USA, Inc. v. King Mountain Tobacco Co.*, 569 F.3d 932, 942 (9th Cir. 2009). The Crow Court of Appeals held the tribe had jurisdiction over BHCEC under the first *Montana* exception, to which BHCEC disagrees. (*Cf.* Docs. 1-5 at 9-10; 83-4 at 22.)

BHCEC first argues that the mere fact that it delivers service to cooperative members on the Crow Reservation does not justify the conclusion that it gave implicit consent to Tribal regulation.  (Doc. 83-4 at 17.)  While BHCEC acknowledges the Ninth Circuit's holding in *Big Horn County Electric Cooperative v. Adams*, 219 F.3d 944, 951 (9th Cir. 2000) ("*Adams*"), recognizing a consensual relationship between the Tribe and BHCEC, it asserts that no nexus exists between the relationship and the regulation at issue.  (*Id.* at 22.)  Thus, BHCEC asserts that the Crow Court of Appeals' reliance on a consensual relationship to establish jurisdiction under the first *Montana* exception is erroneous.  (*Id.*)

Tribal Defendants respond that the Ninth Circuit's holding in *Adams* resolved the issue of whether BHCEC has a consensual agreement with the tribe or its members.  (Doc. 102 at 18.)  Thus, Tribal Defendants argue that the doctrine of collateral estoppel, or issue preclusion, precludes Big Horn from re-litigating the issue.  (*Id.*)

In *Adams*, BHCEC brought an action against officials of the Crow Tribe, challenging the tribe's imposition of a 3% ad valorem tax on "utility property"[2]

---

[2] Defined as "all property used for utility purposes under an agreement conferring rights to use or possess trust land on the reservation … including, but not limited to, a lease, right of way …"  *Adams*, 219 F.3d at 948 (citing Railroad and Utility Tax Code § 202(H)).

16

located on Tribal or trust lands within the reservation.  *Adams*, 219 F.3d at 948.

The Ninth Circuit held that the utility property subject to the tax was located on

BHCEC's right-of-way, which was the equivalent to non-Indian fee land.  *Id.* at

950.  Therefore, for the Tribe's regulatory jurisdiction to exist, one of the *Montana*

exceptions had to apply.  *Id.*

In analyzing the first exception, the *Adams* Court found that BHCEC's

activities on the reservation were sufficient to establish a consensual relationship,

stating "[t]he district court correctly concluded that Big Horn formed a consensual

relationship with the Tribe because Big Horn entered into contracts with the tribal

members for the provision of electrical services."  *Id.* at 951.  Thus, while the

Court found the agreements creating BHCEC's rights-of-way did not create a

consensual relationship, it concluded that "Big Horn's voluntary provision of

electrical services on the Reservation did create a consensual relationship."  *Id.*

Nevertheless, the Ninth Circuit found the first Montana exception did not

apply.  *Id.*  The Court pointed out that "*Montana* limits tribal jurisdiction under the

first exception to the regulation of 'the *activities* of nonmembers who enter [into]

consensual relationships.'"  *Id.*, (citing *Montana*, 450 U.S. at 565) (emphasis

added).  It found that that the tax the Tribe sought to impose was not a tax on

"activities," but was instead a tax of the value of "utility property."  *Id.*

17

That is not the case here.  As in *Adams*, BHCEC's voluntary provision of electrical services on the Crow Reservation created a consensual relationship with the Big Man and the Tribe.  (*See* Doc. 106.)  Unlike the tax in *Adams*, however, the prohibition against discontinuing electrical service in the winter months is a regulation on the activities of BHCEC, and thus squarely within the consensual relationship exception.

The Court further finds a sufficient nexus exists between the consensual relationship and the disputed regulation.  BHCEC's conduct – terminating Big Man's electric service for non-payment – that the Crow Tribe seeks to regulate arises directly out of the consensual relationship created by Big Horn's provision of electrical services on the Reservation.  Even looking at the issue more narrowly, there is also a nexus between the BHCEC/Big Man contract and the activity being regulated.  But for the contract between BHCEC and Big Man, BHCEC would not have the right to terminate service for non-payment and Big Man would never have obtained electricity in the first place.  Thus, the Court finds a nexus between BHCEC's consensual relationship and Big Man's underlying claim in Crow Tribal Courts.

Therefore, the Court finds that the first *Montana* exception is satisfied.

/ / /

### b. *Montana's* Second Exception: Direct Effects

The second exception under the *Montana* framework holds that a tribe retains civil authority over non-Indian conduct when that conduct threatens or has some direct effect on the political integrity, economic security, or health and welfare of the tribe. *Knighton v. Cedarville Rancheria of Northern Paiute Indians*, 922 F.3d 892, 904 (9th Cir. 2019); *Montana*, 450 U.S. at 566. The non-member's "conduct must do more than injure the tribe, it must 'imperil the subsistence' of the tribal community." *Plains Commerce Bank*, 554 U.S. at 341; *FMC Corp. v. Shoshone-Bannock Tribes*, 942 F.3d 916, 935 (9th Cir. 2019).

BHCEC argues that the case does not involve conduct on fee land that imperils the subsistence of the Crow Tribal community and thus the second *Montana* exception is inapplicable. (Doc. 83-4 at 27.)

Tribal Defendants argue that BHCEC's activities and conduct seriously threaten the health and welfare of the Crow Tribe. (Doc. 102 at 28.) In support, Tribal Defendants cite to *Glacier Elec. Coop. v. Gervais*, 2015 WL 13650531, at *4 (D. Mont. Apr. 24, 2015).

The Court agrees with Tribal Defendants and the finding in *Glacier Elec. Coop.* that "winter shut-off[] undoubtedly has a direct effect on the health or welfare" of the tribe. *Glacier Elec. Coop.*, 2015 WL 13650531, at *4. Here, the parties agree that Big Man's power was shut off at the end of January 2012, which

19

is the dead-middle of Montana's winter.  (Docs. 1 at ¶ 15; 1-2 at 2.)  At oral

argument, the parties agreed that the Administrative Rules of Montana regulating

and restricting termination of service during winter months does not apply to

electric cooperatives.  (*Cf.* Mont. Code Ann. § 35-18-104 and A.R.M. §

38.5.1410.)  Thus, any BHCEC customer who is a Tribal member and lives within

the exterior boundaries of the Crow Reservation, regardless of the land status of

their property, is implicated by BHCEC's on-reservation activities or conduct.  The

termination of heat in the middle of the winter clearly poses a danger to the health

and welfare of Big Man, and potentially to any Tribal member who obtains

electrical services from BHCEC within the reservation boundaries, and thus the

Crow Tribe itself.

Therefore, the Court finds that BHCEC's conduct of terminating electrical

service during winter months has a direct effect on Tribal members and the Tribe,

satisfying the second *Montana* exception.

### B.     Enforceability of the Membership Agreement

BHCEC argues that when Big Man (or the Crow Tribe) became a

cooperative member, the choice of law provision identifying "the laws of the State

of Montana," as well as the related-forum provisions naming the "Thirteenth

Judicial District"[3] in Big Horn County, is an unmistakable waiver of Tribal

jurisdiction.  (Doc. 83-4 at 24-25; Doc. 1-6 at ¶ 4.)

Big Man responds that the BHCEC membership agreement's choice of law

and forum provisions are unenforceable.  (Doc. 100 at 10.)  Big Man's cross-

motion for summary judgment further argues that the Court should refrain from

addressing enforceability and affirm the Crow Court of Appeals decision.  (Doc.

85 at 6.)

BHCEC responds that the choice of law and forum provisions are reasonable

and enforceable and were wholly ignored by the Crow Court of Appeals.  (Doc. 99

at 23.)  BHCEC asserts that the membership provisions should have precluded Big

Man's action in the Crow Courts in the first place, just as the Crow Trial Court

found.  (*Id.* at 23-24.)

The Court finds that the enforceability of the membership agreement is not

at issue in this case and therefore will not address the merits of the parties'

arguments.  BHCEC appears to recognize this in its briefing and conceded the

point during the motions hearing.  (*Id.* at 23) ("Though the contract between Mr.

Big Man and Big Horn is not directly at issue in this matter ...").  BHCEC sought

specific declaratory and injunctive relief under the Declaratory Judgment Act, 28

U.S.C. § 2201, relating to Tribal legislative and adjudicative jurisdiction.  (*See*

---

[3] Now the Twenty-Second Judicial District.

Doc. 1 at 5-6, 12-15.)  The present case is thus confined to matters involving tribal jurisdiction.  If it chooses to do so, BHCEC may raise the choice of law issue in Tribal Court.

BHCEC also argues, however, that the choice of law and forum provision constitutes a waiver of Tribal authority.  Whether the forum provision constitutes a waiver of Tribal authority is relevant to the issue of Tribal jurisdiction raised by BHCEC in this declaratory action.

BHCEC asserts that the choice of law and forum provisions of the Big Man's membership agreement effectively operates as a waiver of sovereign power to regulate BHCEC.  (Doc. 83-4 at 24-25.)  In support, BHCEC relies on *Arizona Public Service Co. v. Aspaas*, 69 F.3d 1026, 1034-35 (9th Cir. 1995),[4] for the proposition that a sovereign can waive their power to regulate in "sufficiently clear contractual terms."  (*Id.* at 24.)

In *Aspaas*, the terms of a power plant lease on Tribal trust land between (non-Indian electric utility) Arizona Public Service Company ("APS") and the Navajo Nation were directly at issue in the federal district court action.  *Arizona Pub. Serv. Co. v. Aspaas*, 77 F.3d 1128, 1129-1130 (9th Cir. 1995).  The defendants were officials of the Navajo Nation, which included signatories of the

---

[4] Amended and superseded on denial of rehearing by *Arizona Pub. Serv. Co. v. Aspaas*, 77 F.3d 1128 (9th Cir. 1995).

lease at issue as well as judicial officers adjudicating the alleged violation of Tribal law. *Id.* at 1130, 1132. The issue presented was whether the Navajo Nation could regulate APS's employment policies. *Id.* at 1130. The explicit terms of the power plant lease waived the Tribe's right to regulate employment practices at the power plant, which ultimately conflicted with the subsequent enactment of the Navajo Preference in Employment Act, a Tribal anti-discrimination employment law. *Id.* After exhaustion in Tribal court, APS filed suit in federal district court contending waiver of Tribal regulatory authority. *Id.* The district court agreed and entered judgment for APS. *Id.* at 1131-32.

The Ninth Circuit affirmed on appeal. *Id.* at 1135. The court pointed out that an Indian tribe "can waive sovereign power if they do so in sufficiently clear contractual terms." *Id.* The court found that agreement between APS and the Navajo Nation contained the requisite unmistakable waiver. *Id.* The court further found that the Navajo Tribal Council, as the governing body of the Navajo Nation, had the authority to waive sovereign police powers in the lease agreement. *Id.*

*Aspaas* is clearly distinguishable from the present case. First and foremost, this is not a situation where the Crow Tribal Council has contracted to waive its sovereign powers. The contract at issue is a contract between Big Man and BHCEC. Big Man, for his part, does not have the power or authority to waive sovereign police power in the way that the Navajo Tribal Council had authority to

sign a waiver.  See *Id.*  Further, the membership agreement does not include the same explicit language at issue in *Aspaas*, which read: "The Tribe covenants that, other than as expressly set out in this agreement, it will not directly or indirectly regulate or attempt to regulate the Company … or its … operating practices, procedures … or other policies or practices."  *Id.* at 1130.  Here, the membership agreement applies the laws of Montana "for the purpose of determining the rights of the Cooperative and the Applicant hereunder" and designates the county district court the jurisdiction and venue "for the purpose of actions or proceedings brought to determine the rights of the Cooperative or the Applicant …"  (Doc. 1-6 at ¶ 4.) This language, even if applicable to the Crow Tribe, does not constitute an unmistakable waiver of sovereign authority.  *See Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 148 (1982) ("Without regard to its source, sovereign power, even when unexercised, is an enduring presence that governs all contracts subject to the sovereign's jurisdiction, and will remain intact unless surrendered in unmistakable terms.")

Thus, the Court finds that the choice of law and forum selection provisions contained in Big Man's membership agreement with BHCEC does not constitute a "unmistakable" waiver of sovereign authority.

/ / /

/ / /

24

## IV.    Conclusion

In sum, the Court finds that the Crow Tribe has jurisdiction over Big Man's claim against BHCEC under its inherent sovereign right to exclude, as well as both *Montana* exceptions.  Therefore,

**IT IS RECOMMENDED** that Tribal Defendants motion for summary judgment (Doc. 87) should be **GRANTED**; Big Man's motion for summary judgment (Doc. 84) should be **GRANTED** on the issue of whether the membership agreement constituted a waiver of the Crow Tribe's sovereign power to regulate BHCEC; and BHCEC's motion for summary judgment (Doc. 83) should be **DENIED**.

**NOW, THEREFORE, IT IS ORDERED** that the Clerk shall serve a copy of the Findings and Recommendation of United States Magistrate Judge upon the parties.  The parties are advised that pursuant to 28 U.S.C. § 636, any objections to the findings and recommendation must be filed with the Clerk of Court and copies served on opposing counsel within fourteen (14) days after entry hereof, or objection is waived.  D. Mont. Local Rule 72.3.

**IT IS ORDERED**.

DATED this 21st day of July, 2020.

_____
TIMOTHY J. CAVAN
United States Magistrate Judge